GTE NORTH INCORPORATED and Contel of the South Incorporated, Plaintiffs,

v.

William D. McCARTY, Mary Jo Huffman, G. Richard Klein, Camie Swanson–Hill, David Ziegner (In Their Official Capacities as Commissioners of the Indiana Utility Regulatory Commission), and AT & T Communications of Indiana, Inc., Defendants.

GTE NORTH INCORPORATED and Contel of the South, Incorporated, Plaintiffs,

v.

William D. McCARTY, Mary Jo Huffman, G. Richard Klein, Camie Swanson–Hill, David Ziegner (In Their Official Capacities as Commissioners of the Indiana Utility Regulatory Commission), and MCI Telecommunications Corporation, Defendants.

GTE NORTH INCORPORATED and Contel of the South, Incorporated, Plaintiffs,

v.

William D. McCARTY, Mary Jo Huffman, G. Richard Klein, Camie Swanson–Hill, David Ziegner (In Their Official Capacities as Commissioners of the Indiana Utility Regulatory Commission), and Sprint Communications Company, L.P., Defendants.

Nos. 1:97–CV–0012, 1:97–CV–0058 and 1:97–CV–0066.

United States District Court, N.D. Indiana, Fort Wayne Division.

Sept. 5, 1997.

Thomas W. Belleperche, Hunt Suedhoff Borror and Eilbacher, Fort Wayne, IN, Ray V. Hartwell, III, Lewis F. Powell, III, Hunton & Williams, Richmond, VA, Paul T. Cappuccio, Eugene F. Assaf, Kirkland & Ellis, Washington, DC, Mark L. Austrian, Collier, Shannon, Rill & Scott, PLLC, Washington, DC, William P. Barr, Ward W. Wueste, Jr., M. Edward Whelan, III, GTE Service Corp., Washington, DC, for GTE North, Inc., Contel of the South Inc. in No. 1:97–CV–0012.

Thomas W. Belleperche, Hunt Suedhoff Borror and Eilbacher, Fort Wayne, IN, Paul T. Cappuccio, Eugene F. Assaf, Kirkland & Ellis, Washington, DC, Mark L. Austrian, John B. Williams, Karen M. Lockwood, Collier, Shannon, Rill & Scott, PLLC, Washington, DC, William P. Barr, Ward W. Wueste, Jr., M. Edward Whelan, III, GTE Service Corp., Washington, DC, John A. Rogovin, O'Melveny and Myers, Washington, DC, Dale Sporleder, GTE North Inc. Indianapolis, IN, for GTE North, Inc. in No. 1:97–CV–0058.

Thomas W. Belleperche, Hunt Suedhoff Borror and Eilbacher, Fort Wayne, IN, Paul T. Cappuccio, Eugene F. Assaf, Kirkland & Ellis, Washington, DC, Mark L. Austrian, John B. Williams, Karen M. Lockwood, Collier, Shannon, Rill & Scott, PLLC, Washington, DC, William P. Barr, Ward W. Wueste, Jr., M. Edward Whelan, III, GTE Service Corp., Washington, DC, John A. Rogovin, O'Melveny and Myers, Washington, DC, for Contel of the South, Inc. in No. 1:97–CV–0058.

Thomas W. Belleperche, Hunt Suedhoff Borror and Eilbacher, Fort Wayne, IN, Ray V. Hartwell, III, Lewis F. Powell, III, Hunton & Williams, Richmond, VA, Paul T. Cappuccio, Eugene F. Assaf, Kirkland & Ellis, Washington, DC, Mark L. Austrian, Karen M. Lockwood, Mary Jean Fell, Collier, Shannon, Rill & Scott, PLLC, Washington, DC,

William P. Barr, Ward W. Wueste, Jr., M. Edward Whelan, III, GTE Service Corp., Washington, DC, John A. Rogovin, O'Melveny and Myers, Washington, DC, Dale Sporleder, GTE North Inc. Indianapolis, IN, for GTE North, Inc. in No. 1:97–CV–006.

Cindy M. Lott, Office of Indiana Attorney General, Indianapolis, IN, for John Mortell, Mary Jo Huffman, G. Richard Klein, Camie Swanson–Hull, David Ziegner, William D. McCarty in Nos. 1:97–CV–0012, 1:97–CV–0058 and 1:97–CV–0066.

Steven L. Jackson, Baker and Daniels, Fort Wayne, IN, Michael J. Huston, Kevin M. Toner, Duejean C. Garrett, Baker & Daniels, Indianapolis, IN, Frederic J. Artwick, Anne E. Rea, Jon Loevy, Sidley & Austin, Chicago, IL, William A. Davis, II, John J. Reidy, III, AT & T Communications of Indiana, Inc. Chicago, IL, for AT & T Communications of Indiana, Inc. in No. 1:97–CV–0012.

Jon E. DeGuilio, U.S. Attorneys Office, Dyer, IN, Deborah M. Leonard, U.S. Attorneys Office, Fort Wayne, IN, Theodore C. Hirt, U.S. Dept. of Justice, Washington, DC, Brian G. Kennedy, U.S. Dept. of Justice, Washington, DC, for F.C.C. and U.S. in No. 1:97–CV–0058.

Jon E. DeGuilio, U.S. Attorneys Office, Dyer, IN, Deborah M. Leonard, U.S. Attorneys Office, Fort Wayne, IN, Theodore C. Hirt, Phillip J. Green, U.S. Dept. of Justice, Washington, DC, for F.C.C. and U.S. in No. 1:97–CV–0066.

George E. Purdy, C. Joseph Russell, Bose McKinney and Evans, Indianapolis, IN, William Single, IV, MCI Telecommunications Corp., Washington, DC, Robert K. Johnson, Bose McKinney & Evans, Indianapolis, IN, Donald B. Verrill, Jr., Maureen F. Del Duca, Douglas H. Hsaio, Jenner and Block, Washington, DC, for MCI Telecommunications Corp. in No. 1:97–CV–0058.

Kristin L. Altice, Ice Miller Donadio and Ryan, Indianapolis, IN, David P. Murray, A. Renee Callahan, Willkie Farr and Gallagher, Washington, DC, for Sprint Communications Co., L.P. in No. 1:97–CV–0066.

---

1. These cases were originally filed with John Mortrell as the first named defendant. William

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the court on motions to dismiss brought by the defendants in the following three cases: *GTE North Inc. and Contel of the South Inc. v. McCarty,*[1] *et al., and AT & T Communications of Indiana,* No. 1:97–CV–0012 (N.D.Ind. filed Jan. 10, 1997) (the "AT & T case"); *GTE North Inc. and Contel of the South, Inc. v. McCarty, et al., and MCI Telecommunications Corp.,* No. 1:97–CV–0058 (N.D.Ind. filed February 11, 1997) (the "MCI case"); and *GTE North Inc. and Contel of the South Inc. v. McCarty, et al., and Sprint Communications Company L.P.,* No. 1:97–CV–66 (N.D.Ind. filed Feb. 20, 1997) (the "Sprint case"). Subsequent to the filing of these cases, the United States and the Federal Communications Commission (the "FCC") intervened. Briefing was completed on August 29, 1997.

Because the facts and legal issues in all of these cases are similar, if not virtually identical, they will be consolidated and discussed together in this memorandum. For convenience, the various defendants will not be referred to by their individual names unless necessary.

## LEGAL BASES OF THE MOTIONS

Plaintiffs GTE North Incorporated and Contel of the South Incorporated (together, "GTE") filed complaints asking this court to review arbitration orders (the "Arbitration Orders") issued by the Indiana Utility Regulatory Commission (the "IURC") on 12 December 1996, 3 January 1997, and 15 January 1997, in the AT & T case, the MCI case, and the Sprint case, respectively. GTE asks the court to grant declaratory relief stating that those orders violate the Telecommunications Act of 1996 (the "Act") and also to enjoin Defendants from taking any action to require GTE to execute agreements with AT & T, MCI, or Sprint that include the terms of the Arbitration Orders.

D. McCarty has since been substituted in his place.

Defendants come forth with a plethora of reasons for dismissal. First, Defendants contend that this court lacks subject matter jurisdiction under § 252(e)(6) of the Act. Second, they contend that GTE's action is not ripe for review. Third, they claim that GTE has failed to exhaust its administrative remedies. Fourth, Defendants argue that, even if jurisdictional and ripeness defects did not bar GTE's complaints, this court should exercise its discretion and choose not to grant declaratory relief. Finally, McCarty, *et al.*, move to dismiss on the ground that the claims against them as commissioners of the IURC are barred by the Eleventh Amendment. It is on this last issue alone that the United States and the FCC have intervened.

## STATUTORY BACKGROUND AND FACTS

### A. *Background and Structure of the Act*

The Act adds a new subchapter to the Communications Act of 1934 that is designed to foster the rapid development of competition in the local telephone services market. *See Joint Explanatory Statement of the Committee of Conference*, H.R.Rep. No. 104–458, at 113 (1996). It ends the prior regulated-monopoly regime whereby local carriers had exclusive control over local facilities, and replaces it with a pro-competitive regime. The Act employs three sections as the primary tools for effecting that strategy, Sections 251, 252, and 253.

Section 253 in effect destroys the previous state monopolies by authorizing the FCC to preempt state laws that prohibit entities from offering intrastate or interstate telephone services. Section 251 imposes numerous duties on incumbent carriers like GTE, such as the duties to permit other carriers to "interconnect" with the incumbent's facilities, to provide other carriers access to elements of the incumbent's local network on an unbundled basis, and to sell to other carriers at wholesale any telecommunications services the incumbent provides to its customers at retail. Section 252 establishes procedures for negotiating, arbitrating, and approving the interconnection agreements between incumbents and requesting carriers. Since it is § 252 which is directly relevant to the

motions to dismiss, it will be examined in further detail.

Section 252 sets forth a four-part structure for the implementation of the Act. First, § 252(a)(1) gives the incumbent and requesting carrier a chance to voluntarily negotiate their own agreement. If they come to an agreement on a voluntary basis, § 252(a)(1) relieves them of the substantive requirements of § 251(b) and (c). Second, if no voluntary agreement can be reached, § 252(b) allows any of the parties, during the period from the 135th to the 160th day from the initial request, to petition a state commission to arbitrate any open issues. A state commission's arbitration must be limited to the issues presented to it by the parties, and all unresolved issues raised by the arbitration petition must be resolved by a state commission within nine months of receiving the petition. § 252(b)(4)(A), (C). Third, to be effective, any interconnection agreement must be submitted to a state commission for approval. § 252(e)(1). A state commission may only reject an agreement (or parts thereof) adopted by negotiation if it discriminates against a carrier not a party to the agreement or if it is not in the public interest. § 252(e)(2)(A). An agreement adopted by arbitration (or parts thereof) may be rejected if it fails to meet the requirements of § 251 (including FCC regulations) or § 252(d) (which provides for pricing standards). § 252(e). Once a final agreement is submitted, a state commission must rule on it in ninety days if it is a negotiated agreement, or thirty days if it is an arbitrated agreement. If it does not, the agreement is deemed to be approved. § 252(e)(4). Fourth, § 252 provides for judicial review. The paragraph providing for judicial review, 252(e)(6), reads as follows:

**In a case in which a state fails to act as described in paragraph (5), the proceeding by the Commission [meaning the FCC] and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may**

bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section.

■ One other provision of the Act which is relevant only to the Sprint case is § 252(i). That subsection directs local incumbent carriers to make available "any interconnection, service, or network element provided under an agreement approved under [§ 252] to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." The practical effect of § 252(i) is to prohibit incumbent carriers from exercising a preference for one carrier over another.

## B. *Facts*

### 1. *The AT & T Case*

Sometime in March 1996, AT & T asked GTE for interconnection agreements in the twenty states in which GTE is a monopoly provider, including Indiana. The two parties began negotiating, but the negotiations broke down not long thereafter. On August 16, 1996, AT & T filed a petition for arbitration with the IURC. Exactly one month later, GTE filed its response. On October 10–11, hearings were conducted before an arbitration facilitator appointed by the IURC. The IURC issued an arbitration order on December 12, 1996. That decision, which GTE asks this court to review, ordered GTE and AT & T to submit a joint interconnection agreement reflecting the rulings of such order to the IURC within thirty days. That time was later extended to February 6.

On February 6, 1997, the parties submitted some form of agreement, but there is a dispute over exactly what that agreement is. GTE indicates that it believes the agreement is a final agreement and thus it believes the IURC should have approved it within the required thirty days. However, the "Joint Application" which was submitted with the agreement says that the agreement includes disputed contractual provisions and asks the IURC to resolve those disputes. (State Defendants' AT & T Brief, Exhibit E.) The

IURC deems such agreements not to be final agreements that cause the thirty-day period to run.

On March 27, 1997, GTE filed a letter with the IURC stating that GTE and AT & T had agreed on certain points, but were still in the process of negotiating. (State Defendant's AT & T Reply Brief, Exhibit A.) In that letter, GTE also asked the IURC to take "no action" on the February 6 Joint Application. AT & T sent the IURC a reply letter on March 31, disagreeing with some of the matters GTE had said were resolved, and also stating that if the parties could agree upon contractual language prior to the time an agreement were executed, AT & T would include the agreed-upon language in the final version regardless of how the IURC had decided the issue should be resolved in its arbitration order. (State Defendants' AT & T Reply Brief, Exhibit B.)

In any event, the IURC says it has not yet received a final, executed agreement from AT & T and GTE, and all agree that the IURC has not approved or rejected an interconnection agreement pursuant to § 252(e). Thus, no final, ruled upon agreement is currently before the court.

### 2. *The MCI Case*

MCI requested interconnection from GTE on April 3, 1996. As with AT & T, the negotiations failed to produce agreement on many important points. Therefore, on September 10, 1996, MCI filed a petition for arbitration pursuant to § 252(b)(1). GTE and MCI had the opportunity to present their positions at an arbitration hearing held on October 31 and November 1, 1996.

The IURC issued an order on January 3, 1997, that purported to resolve the issues between the parties. MCI and GTE were directed to file "an executed copy of the parties' Interconnection Agreement reflecting [the IURC's] resolution of the disputed issues as described in [the] order." The timetable for review under the Act was set to commence on the date that the Agreement is submitted to the IURC for approval. *In re: Petition for Arbitration Pursuant to Section 252(b) of the Telecommunications Act of 1996* (GTE Complaint in MCI case, Exhibit

2.) Although the IURC ordered GTE and MCI to submit an executed Interconnection Agreement by February 3, 1997, the parties filed an agreement with the IURC on February 4, which included agreed-upon language but also included separate, "red-lined" proposals for language on issues where agreement could not be reached.

Responding to a request for further guidance from the parties, the IURC ruled that the agreement which had been submitted to it was not an interconnection agreement, and also ordered the parties to file "their written comments on the areas of confusion or disagreement which have kept the parties from filing an interconnection agreement on which the parties can take actions." Docket Entry, Feb. 18, 1997, at pp. 1–2, in *Petition for Arbitration Pursuant to Section 252(b) of the Telecommunications Act of 1996.* (Appendix to MCI Brief.) The IURC has yet to rule on the areas of disagreement or to approve or reject a final agreement pursuant to § 252(e)(1), although GTE appears to believe that it should have done so by now.

### 3. *The Sprint Case*

Sprint's interconnection request came on April 18, 1996. Not surprisingly, Sprint and GTE also failed to resolve numerous material issues. Thus, Sprint filed a petition for arbitration with the IURC on September 25, 1996. The IURC issued an arbitration order on January 15, 1997, directing the parties to file an executed interconnection agreement for final review by February 14, to include both agreed-upon and arbitrated terms and conditions.

It is at this point where the Sprint case takes a slightly different turn than the others, although not in a way which will have much bearing on the present motions. Apparently, sometime after the January 15 order, Sprint became aware of the proposed terms and conditions of GTE's interconnection agreements with AT & T around the country. Parts of the proposed AT & T agreement(s) (it is unclear whether Sprint is referring just to the agreement proposed in Indiana or more generally to the terms of several agreements in other jurisdictions) contained, in Sprint's view, terms which were more favorable than GTE was offering it. Therefore, Sprint decided to exercise its right under § 252(i) to receive the same terms and conditions offered to AT & T— when and if that agreement finally gets approved.

Accordingly, Sprint informed GTE and the IURC of its intention and asked the IURC to extend the time for the submission of an executed agreement to two weeks after the IURC approves an interconnection agreement between AT & T and GTE, which the IURC did. GTE decided to challenge Sprint's 251(i) election, and filed with the IURC what it claims to be a final interconnection agreement that was in compliance with the terms of the arbitration order. The question of whether Sprint had the right to elect under § 252(i) is pending before the IURC now. At any rate, it is undisputed that the IURC has not yet either approved or rejected a final interconnection agreement between GTE and Sprint in accordance with § 252(e)(1).

## LEGAL DISCUSSION

### A. *Subject Matter Jurisdiction*

■ The court does not presently have subject matter jurisdiction over GTE's complaints. This determination is supported by the language, structure, and purpose of the Act, as well as case law interpreting the Act.

■ F.R.C.P. 12(b)(1) allows a defendant to bring a motion to dismiss for lack of subject matter jurisdiction prior to the service of a responsive pleading. When considering a motion to dismiss for lack of subject matter jurisdiction, courts are not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction. *Kontos v. U.S. Dep't of Labor,* 826 F.2d 573 (7th Cir.1987). A district court is prohibited from exercising subject matter jurisdiction when it is found that Congress intended to preclude review. *See Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 201–03, 114 S.Ct. 771, 774, 127 L.Ed.2d 29 (1994). In cases such as these, which involve delayed judicial review of agency actions, a determination that Congress

intended to preclude initial judicial review need only be "fairly discernible" from the language, structure, purpose, and legislative history of a statutory scheme. *See Block v. Community Nutrition Institute*, 467 U.S. 340, 345, 351, 104 S.Ct. 2450, 2453–54, 2456–57, 81 L.Ed.2d 270 (1984). Under those criteria, it is evident that Congress intended to delay judicial review under the Act until the approval or rejection of a final agreement by a state commission, for several reasons.

First and foremost, the explicit language of § 252(e)(6) compels the conclusion that there is no subject matter jurisdiction at this time. The disputed language on which this issue turns is the following sentence of § 252(e)(6):

**In any case in which a State commission makes a determination under this Section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 [47 U.S.C.S. § 251] and this section.**

Directly at issue is the meaning of the word "determination." GTE contends that the inclusion of the word "determination" means that this court can review the Arbitration Orders immediately. Defendants argue that the language "to determine whether the agreement or statement [2] meets the requirements" means that Congress intends for judicial review to occur only after a final interconnection agreement has either been approved or rejected pursuant to § 252(e)(1).

Defendants are correct. The inclusion of the word "agreement," which clearly refers to an interconnection agreement, modifies the word "determination" in such a way as to make the most likely interpretation of "determination" to be the decision made by a state commission upon the rejection or approval of a final, executed interconnection agreement under § 252(e)(1). If Congress had intended to give courts authority to review any determination of a state commission at any time, there would have been no need to include the reference to an agreement.

An alternative interpretation is that "determination" does indeed refer to any decision, including arbitration orders, but that those decisions may not be reviewed until a final agreement is ruled on. However, that interpretation is less preferable because in reviewing the final agreement, as explained below, prior decisions made concerning the agreement will necessarily be reviewed if they are reflected in the agreement. In any event, no substantive review of any kind is contemplated by the Act until a state commission has had the chance to approve or reject a final agreement.

GTE also argues that the inclusion of the word "agreement" means that courts can review a state commission's determinations as to what an agreement *must* say, rather than what a final agreement actually says. That is contradicted by § 252(e)(6)'s explicit language, which clearly says that federal district courts should determine "whether *the agreement*" (emphasis added) does or does not comply with the Act. It does not say that courts should determine "whether agreements or orders regarding agreements" are in compliance with the Act.

Second, the structure of the Act compels the conclusion that only the review of a final interconnection agreement is permitted. As discussed, the Act sets forth a precise procedure for the implementation of its terms, including voluntary negotiation, arbitration, final approval by a state commission, and judicial review. The approval or rejection of an interconnection agreement is the final step to its effectiveness, unless one of the parties appeals to the federal judiciary. That implies that Congress wants the parties to proceed through the entire statutory process before federal court intervention.

Moreover, the Act provides specific criteria which are the only grounds for a state commission's rejection of an agreement, depending upon whether the agreement is negotiated or arbitrated. If the agreement (or parts thereof) is implemented by arbitration, such as is the case here, the state commission may reject it only if the agreement (or parts thereof) fails to meet the requirements of § 251 (including the FCC regulations issued thereunder) and the standards of § 252(d).

**2.** There is no question that the Arbitration Orders are not statements under the Act.

Notably, the causes for rejection do not include the failure to comply with a state commission's arbitration order. That is because a variety of actions could take place after the issuance of an arbitration order which would affect the content of the final agreement.

For one, it is conceivable, even probable, that a state commission might decide, once it sees an executed agreement, that parts of a previously issued arbitration order were wrongly decided. That possibility refutes GTE's contention—which it makes throughout its briefs—that the Arbitration Orders will necessarily not be reviewed and the substance possibly altered when the IURC considers the final agreements. As alluded to previously, the review of a final agreement whose terms reflect an arbitration order will necessarily entail the review of the substance of that order as then set forth in concrete contractual language. Certainly, a state commission should be given the chance to correct any mistakes made by the arbitrator before federal court review. Given that possibility, it does not make sense to read the Act as mandating judicial review of determinations that might not even be reflected in a final agreement because a state commission could decide upon final review that certain terms of a previous arbitration order do not make sense when viewed in the context of a completed agreement.[3]

Furthermore, in the AT & T and MCI cases, the parties submitted agreements, after the arbitration orders were issued, which contained disputed language. Thus, it would appear that the parties intend the IURC to decide between the different language submitted by the parties. Thus, GTE's own actions lend credence to the view that the Act allows further negotiations and decisions subsequent to an arbitration decision. Again, it would not make sense to interpret the Act as allowing judicial review when there is the possibility that further decisions might be made which would also require review. The Act is not only intended to create competition for local telephone services, but to do so rapidly, and allowing for piecemeal judicial review time and time again would be contrary to the Act's purpose.

█ Even if GTE were correct that the Arbitration Orders were absolutely the IURC's last word on the disputed issues, its argument would still miss the point. Congress has simply not given courts the authority to abstractly interpret the Act. Rather, the Act is to be interpreted and applied in the context of the review of specific agreements, and then only after a state commission has taken final action with respect to such agreements.

What is more, GTE's argument does not address the possibility—indeed, probability—that new issues might arise between the time an arbitration order is issued and the time an agreement is ruled upon, which would necessitate another round of review before this court. It is quite possible that the parties could subsequently agree to terms other than those prescribed by an arbitration order, although certainly one party could not unilaterally reject an arbitrated determination. AT & T alluded to that possibility in its letter to the IURC in which it said that GTE and it will include any language that can be agreed upon regardless of if it complies with the IURC's arbitration order. And in fact, the arbitration order in the MCI case specifically provides that the parties may opt out of the language mandated by the order if they can agree to other language.

The following scenarios illustrate the potential problems which could arise from a review of the Arbitration Orders at this time. Suppose the court adopts GTE's position, reviews the arbitration order from the MCI case now, and decides that it does indeed comply with the Act. GTE and MCI then return to the bargaining table and execute a final agreement, but in doing so they decide to ignore or opt out of part of the arbitration order and agree to language or terms of their own. After review, the IURC rejects that agreement, stating that the substituted portions violate the Act. One or both of the

---

**3.** It should be noted that the IURC says that it agrees with GTE's contention that the arbitrations hearings will neither be reopened nor the arbitrator's findings altered. Nevertheless, under the Act, the possibility exists for a state commission to reconsider the substance of a previous arbitration order when reviewing a final agreement that reflects the order.

parties then ask the court to review the correctness of the IURC's decision. Once again, this court has the same case before it. Worse yet, the IURC might approve the agreement with the substituted language, rendering the court's review of the arbitration order an academic exercise.

If simply stating the above possibilities is not enough to refute GTE's position, then the concept of judicial economy is rendered meaningless. Other like situations could easily be imagined. In effect, accepting GTE's position would involve federal courts in the messy process of negotiating interconnection agreements. Clearly, the Act does not contemplate that.

The above scenarios also answer GTE's protest that judicial review at this point would address only those portions of the Arbitration Orders which interpret and apply key parts of the Act, thus obviating, in GTE's view, the need to look at a particular agreement. Again, that would not negate the possibility that new issues might arise once final agreements are ruled upon.

Finally, other courts that have ruled on the same issue have held the language of § 252(e)(6) to mean that federal district courts do not have jurisdiction under the Act until a final agreement has been submitted to and ruled upon by a state commission. *See GTE South Incorporated v. Morrison, et al.,* 957 F.Supp. 800, 804–05 (E.D.Va.1997). *See also GTE North Incorporated, v. Glazer,* No. 5:97CV137 (N.D.Ohio May 12, 1997); *GTE South, Inc. v. Breathitt,* 963 F.Supp. 610 (E.D.Ken.1997); *GTE Northwest, Inc. v. Nelson,* 969 F.Supp. 654 (W.D.Wash.1997); *GTE Northwest Inc. v. Hamilton, et al., and AT & T Communications of Pacific Northwest, Inc.,* 971 F.Supp. 1350 (D.Or.1997) (adopting Magistrate's Findings and Recommendation) (Appendix to MCI's Brief.); *GTE Southwest, Inc. v. Wood,* C.A. No. M–97–003 (S.D.Tex. Mar. 13, 1997); *Contel of Minnesota, Inc., d/b/a GTE Minnesota v. Jacobs, et al., and AT & T Communications of the Midwest, Inc.,* Civil No. 97–169 (D.Minn. May 30, 1997); *GTE Southwest Incorporated v. Graves, et al., and AT & T Communications of the Southwest, Inc.,* No. CIV–97–0078–C (W.D.Okl. June 5, 1997); *GTE North Incorporated and Contel of the South Incorporated, d/b/a GTE Systems of Michigan v. Strand, et al., and AT & T Communications of Michigan, Inc.,* Case No. 5:97–CV–01, 1997 WL 811422 (W.D.Mich. June 2, 1997); *GTE Florida Incorporated v. Johnson, et al.,* 964 F.Supp. 333 (N.D.Fl.1997); *GTE South, Inc. v. Breathitt, et al., and MCIMetro Access Transmission Services, Inc.,* 963 F.Supp. 610 (E.D.Ky.1997).

The court in *GTE South v. Morrison* held, using reasoning similar to that of this Order, that allowing review before a final agreement was approved or rejected would be contrary to the language, structure and purpose of the Act. *GTE South v. Morrison,* 957 F.Supp. at 804–05. This court is especially persuaded by that court's observation that state commissions are unable to rule with finality on issues addressed by their own orders until they have seen how those issues function, both economically and pragmatically, in the context of a completed agreement. *Id.* at 804–05. (citing Commissioners' Memorandum in Support of the Motion to Dismiss at 9 n. 9). That observation supports this court's view that a state commission might change its mind once it reviews a completed agreement.

In conclusion, the language, structure, and purpose of the Act make it fairly discernible that Congress intended to preclude judicial review until a state commission either approves or rejects a final interconnection agreement.

### B. *Ripeness*

Defendants' second argument for dismissal is that these actions are not ripe for review. For the reasons detailed below, Defendants prevail on this argument as well.

The applicable standard is that from *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967). That case asks, first, whether the issues are presented in a posture that is appropriate for judicial review, and second, whether the parties will suffer hardship if review is denied. *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. at 1515–16. In conducting that two-prong analysis, courts

balance the need for a more concrete setting against any hardship that would be caused by delaying review. *See Mount Wilson FM Broadcasters, Inc. v. FCC*, 884 F.2d 1462, 1466 (D.C.Cir.1989). When an agency action is involved, review is appropriate if the agency action is a "final agency action." *Abbott Labs.*, 387 U.S. at 149–53, 87 S.Ct. at 1515–18. Furthermore, it is inappropriate for federal courts to intervene in the midst of an agency process that is mandated by statute. *See FTC v. Standard Oil*, 449 U.S. 232, 242, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980) ("Judicial intervention into the agency process denies the agency an opportunity to correct its own mistakes and to apply its expertise").

The form in which these issues are presented is not appropriate for review because there have been no final determinations in accordance with the Act and thus no final agency actions. As discussed in the previous section, the IURC might decide that parts of its Arbitration Orders were incorrect, or new issues might arise. Furthermore, it must review the final agreements to see that the parties interpreted the orders correctly in drafting the agreements. It is simply impossible at this point to predict what the IURC's final decisions will be, and how it might resolve any disputed issues that are still outstanding. Jumping into these cases in the middle of an agency process would not serve the purposes of the Act.

As to the second prong, the risk that this court may have to review the same issues twice, review issues which may not be a part of the final agreements, or conduct a second round of review for new issues outweighs any harm to the parties under the second prong of the *Abbott Labs.* analysis. Even accepting GTE's argument that it is suffering at least some harm by being forced to negotiate contracts with terms that it believes violate federal law and because it may have to make some business adjustments to prepare for the implementation of those terms, *see Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524–25, 18 L.Ed.2d 697 (1967); *Fort Sumter Tours Inc. v. Andrus*, 564 F.2d 1119 (4th Cir.1977), and notwithstanding that the Act specifically mandates

such negotiation, that relatively minor harm is outweighed by the incomplete posture of these cases. While GTE may suffer some harm by having to prepare for the possibility of the implementation of terms which may later be held unlawful, it will not actually have to implement those terms until after the final agreement is approved.

GTE contends that administrative decisions are automatically ripe for review when a plaintiff has demonstrated the possibility of harm; in support, GTE cites *Lartnec Inv. Co. v. Fort Wayne–Allen Co.*, 603 F.Supp. 1210 (N.D.Ind.1985). GTE is grasping at straws with that argument. In *Lartnec*, injury was the *only* ripeness issue. *Id.* at 1216. Here, there is also the question of submission to the court in the appropriate form, which means the *Abbott Labs.* balancing test applies.

GTE also argues that *Abbott Labs.* is inapplicable where, as it believes to be the case here, there has been a final determination by an agency resolving the issues that were the subject of the adjudication. GTE cites no legal authority for that proposition, but it hardly matters, as GTE would lose even if the court were to adopt that standard, which, in substance, differs very little from the first prong of the *Abbott Labs.* analysis. GTE loses under its own proposed standard because under the Act, there has clearly not been a final adjudication. As discussed above, the final determination of the IURC will not come until it approves or rejects an interconnection agreement, which the parties agree has not been done in any of the cases.

A special mention must be made here about the Sprint case. There is a dispute currently pending before the IURC as to whether Sprint is bound to the terms of the arbitration order or whether it can instead elect to interconnect under the terms and conditions of GTE's agreement with AT & T, once it is approved. That makes the Sprint case especially unripe for review. This court needs to wait until the IURC decides that matter before reviewing any order or agreement. If the court reviews the Sprint/GTE arbitration order now and it later turns out that the IURC decides that Sprint can elect the terms of the AT & T agreement, the

court will have wasted an enormous amount of time.

## C. *Exhaustion of Remedies*

 MCI is the only defendant who raises the contention that GTE's action is barred because it has failed to exhaust its administrative remedies, which is, of course, a time-honored principle. *See, e.g., Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir. 1996); *Glisson v. United States Forest Service*, 55 F.3d 1325, 1326 (7th Cir.1995). As the Seventh Circuit stated in *Glisson,*

> [the exhaustion] **doctrine cuts down on the work of the courts, preserves the integrity and autonomy of the administrative process, and ensures that when the administrative proceeding does come before the court, the court will have before it the mature, considered and final articulation of the basis of the agency's action.**

*Glisson,* 55 F.3d at 1326–27.

Again, this issue turns on whether the Arbitration Orders are the IURC's final decisions under the Act. The discussions on subject matter jurisdiction and ripeness showed that the Arbitration Orders are indeed not necessarily the IURC's final determinations as to the disputed issues. In addition, GTE's persistent argument that no other review will be necessary if the court reviews the orders at this time have been refuted by showing the possibility that new issues might arise thereafter. Because of those reasons, GTE must complete the entire administrative review procedure before appealing to this court.

## D. *Judicial Discretion*

 GTE and Defendants also argue that, even if the court's holdings on subject matter jurisdiction, ripeness, and exhaustion do not go their way, this court should exercise its discretion in their favor. The court agrees with Defendants, and declines to grant declaratory relief at this time for this reason also.

Declaratory relief is entirely discretionary, *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942), and ought not to be granted unless the party seeking it can demonstrate a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment." *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 577 (7th Cir.1994) (citations omitted). Furthermore, declaratory relief should be withheld when the subject of the relief could be modified "so that its ultimate form cannot be predicted," *A.L. Mechling Barge Lines, Inc. v. U.S.*, 368 U.S. 324, 331, 82 S.Ct. 337, 342, 7 L.Ed.2d 317 (1961), and it has long been the case in the Seventh Circuit that litigants are not permitted to use declaratory relief where it "would result in piecemeal trials of the various controversies presented or in the trial of a particular issue without resolving the entire controversy." *Yellow Cab Co. v. City of Chicago*, 186 F.2d 946, 950–51 (7th Cir.1951).

Defendants essentially reiterate their argument that reviewing the Arbitration Orders now risks piecemeal litigation since the court may have to undertake further review of the same or similar issues in the future. Defendants' argument is well-taken, for the same reasons as were discussed in the prior analyses. Reviewing the Arbitration Orders before they are implemented in a concrete agreement and ruled upon in a final decision by the IURC would be a waste of judicial time and resources, because the court might have to review a final, ruled upon agreement at a later date. It would be much more practical to simply review the final agreement and decide all the issues at once.

GTE argues to the contrary that it would be a waste of time to dismiss these actions now. GTE maintains that final agreements were submitted in each of the cases and that they should have been ruled upon within the now expired thirty-day time period.[4] Nevertheless, the IURC does not consider the agreements that were submitted to be final,

---

4. GTE does not—at least directly—ask this court to hold that the agreements which it claims were submitted as final should be deemed approved pursuant to § 252(e)(4). In any event, the court accepts the IURC's determinations that the agreements submitted are not final.

and the court accepts that determination. More importantly, it is undisputed that no final rulings have actually been made as of this date. While a final ruling by the IURC would indeed render this whole debate moot, it is uncontested that the IURC has not yet approved or rejected any final agreement. Furthermore, there is no indication as to when such rulings might be made, and therefore the court will proceed with the dismissals. Besides, any time which is wasted will be *de minimis.* Since the dismissals are made without prejudice, GTE can simply refile its complaints when final agreements have been ruled upon by the IURC. Any additional time will be spent simply amending the complaints to reflect the IURC's final decisions.

### E. *Eleventh Amendment*

■ The commissioners of the IURC claim that they are immune from suit under the Eleventh Amendment, which bars federal jurisdiction over suits brought by citizens of a state other than that of the defendant state or citizens of the defendant state. *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Plaintiffs, the other defendants, and the United States and the FCC, as intervenors, contest the commissioners' position.

Although the disposition of this case has been delayed for three months to allow all parties to be heard on this issue, the court concludes that a determination at this time is unnecessary and inappropriate. It is unnecessary because the court has decided to dismiss GTE's actions on the several aforementioned bases, essentially rendering moot the determination of whether the commissioners are proper parties. It is inappropriate because, since no final agreement has been ruled upon under the Act, the facts on which any such determination might rest have not been fully developed. If GTE refiles its complaints after a such a determination has been made by the commissioners, the court will at that time decide whether the commissioners are proper parties.

### CONCLUSION

All of the reasons for dismissal depend essentially on one question: Has the IURC made a final determination or decision with respect to an interconnection agreement under the terms of the Act? As discussed herein, the answer is clearly no. If the Arbitration Orders were reviewed now, this court would likely be faced in the future with further motions asking for review of the IURC's decisions regarding final interconnection agreements. It is far better to wait for final approval or rejection and decide all issues at once, rather than in a piecemeal fashion.

Accordingly, GTE's actions against AT & T, MCI, Sprint, and the commissioners of the IURC are hereby DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction, lack of ripeness, failure to exhaust remedies, and under this court's traditional discretionary authority. The decision as to whether the IURC commissioners are immune under the Eleventh Amendment is left for another day.