US WEST COMMUNICATIONS, INC., Plaintiff,

v.

MINNESOTA PUBLIC UTILITIES COMMISSION, Edward A. Garvey, Chairman, Joel Jacobs, Commissioner, Marshall Johnson, Commissioner, Gregory Scott, Commissioner, and Don Storm, Commissioner (In Their Official Capacities as Past or Present Commissioners of the Minnesota Public Utilities Commission); and AT & T Wireless Services, Inc., Defendants.

No. CIV. 98–914 ADMAJB.

United States District Court, D. Minnesota.

March 30, 1999.

Geoffrey P. Jarpe and Martha J. Keon, Maun & Simon, PLC; Kevin J. Saville, U.S. West Communications, Inc.; and Wendy M. Moser, Norton Cutler, and Blair A. Rosenthal, U.S. West, Inc., for Plaintiff U.S. West Communications, Inc.

Dennis D. Ahlers and Megan J. Hertzler, Assistant Attorneys General, for Defendants MPUC and the Commissioners.

Mark J. Ayotte and Darrin M. Rosha, Briggs and Morgan, P.A., for Defendant AT & T Wireless Services, Inc.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

Plaintiff U.S. West Communications, Inc., ("US West") brought this action pursuant to the Telecommunications Act of 1996 ("the Telecommunications Act" or "the Act"), specifically 47 U.S.C. § 252(e)(6), seeking judicial review of determinations made by the Minnesota Public Utilities Commission ("MPUC"). US West has named the individual commissioners of the MPUC as Defendants. For purposes of this order, the individual commissioners and the MPUC, itself, will be referred to collectively as the MPUC.

The above-captioned case is one of eight cases involving review of determinations made by the MPUC presently before this Court. On December 10, 1997, this Court issued an Order in *US WEST Communications, Inc. v. Garvey*, No. 97–913 ADM/AJB, slip op. at 3 (D.Minn. Dec. 10, 1997), determining the scope of review for cases brought pursuant to § 252(e)(6). The Court found the scope of review limited to an appellate review of the record established before the MPUC. *Id.* On May 1, 1998, the Court filed an Order addressing the standard of review in the eight Telecommunications Act cases. *AT & T Communications of the Midwest, Inc. v. Contel of Minnesota*, No. 97–901 ADM/JGL, slip op. at 10–11 (D.Minn. April 30, 1998). Questions of law will be subject to *de novo* review while questions of fact and mixed questions of fact and law will be subject to the arbitrary and capricious standard. *Id.* at 11–13.

## I. BACKGROUND

Before 1996, local telephone companies, such as U.S. West, enjoyed a regulated monopoly in the provision of local telephone services to business and residential customers within their designated service areas. *AT&T Communications of Southern States v. BellSouth Telecomms., Inc.*, 7 F.Supp.2d 661, 663 (E.D.N.C.1998). In exchange for legislative approval of this scheme, the local monopolies ensured universal telephone service. *Id.* During this monopolistic period, the local telephone companies constructed extensive telephone networks in their service areas. *Id.*

Congress passed the Telecommunications Act of 1996, in part, to end the monopoly of local telephone markets and to foster competition in those markets. *Iowa Utilities Bd. v. FCC*, 120 F.3d 753, 791 (1997), *rev'd in part sub nom., AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999); *GTE North, Inc. v. McCarty*, 978 F.Supp. 827, 831 (citing Joint Explanatory Statement of the Committee of Conference, H.R.Rep. No. 104–458, at 113 (1996)). Because the local monopolies, or incumbent local exchange carriers ("ILECs" or "incumbent LECs"), had become so entrenched over time through their construction of extensive facilities, Congress opted "not to simply issue a proclamation opening the markets," but rather constructed a detailed regulatory scheme to enable new competitors to enter the local telephone market on a more equal footing. *AT & T Communications of the Southern States*, 7 F.Supp.2d at 663. The Act obligates the incumbent LECs, like U.S. West: (1) to permit a new entrant in the local market to interconnect with the incumbent LEC's existing local network and thereby use the LEC's own network to compete against it (interconnection); (2) to provide competing carriers with access to individual elements of the incumbent LEC's own network on an unbundled basis (unbundled access); and (3) to sell any telecommunication service to competing carriers at a wholesale rate so that the competing carriers can resell the service (resale). *Iowa Utils. Bd.*, 120 F.3d at 791 (citing 47 U.S.C.A. § 251(c)(2)-(4)). In order to facilitate agreements between incumbent LECs and competing carriers, the Act creates a framework for both negotiation and arbitration. 47 U.S.C. § 252. Two sections of the Act, 47 U.S.C. §§ 251 and 252, explain the basic structure of the overall scheme for opening up the local markets.

### Section 251

Section 251 describes the three relevant classes of participants effected by the Act: (1) telecommunications carriers, (2) local exchange carriers, and (3) incumbent local exchange carriers. 47 U.S.C. § 251(a), (b), and (c). A telecommunications carrier is a provider of telecommunications services, 47 U.S.C. § 153(44), telecommunication services being "the offering of telecommunications for a fee directly to the public ...," 47 U.S.C. § 153(46), and telecommunications being "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). Both U.S. West and Defendant AT & T Wireless Services, Inc., ("AWS") qualify as telecommunications carriers. A local exchange carrier ("LEC") is "any person that is engaged in the provision of telephone exchange service or exchange access," 47 U.S.C. § 153(26), within an exchange area. 47 U.S.C. § 153(47). An incumbent local exchange carrier is a company that was an existent local exchange carrier on February 8, 1996, and was deemed to be a member of the exchange carrier association. 47 U.S.C. § 252(h). In this action, only U.S. West qualifies as an incumbent LEC.

Section 251 establishes the duties and obligations of these categories of participants. For example, all telecommunications carriers have a duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications

carriers," 47 U.S.C. § 251(a); local exchange carriers have a duty "not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services." 47 U.S.C. § 251(b); and incumbent LECs have a duty to negotiate in good faith with telecommunications carriers seeking to enter the local service market, as well as a duty to "offer for resale at wholesale prices any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c). Section 251 requires an incumbent LEC to provide interconnection that is at least equal in quality to that provided by the incumbent LEC to itself at any technically feasible point, 47 U.S.C. § 251(c)(2); to provide nondiscriminatory access to network elements on an unbundled basis at any technically feasible point, 47 U.S.C. § 251(c)(3); and to provide for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier. 47 U.S.C. § 251(c)(6).

### Section 252

Section 252 delineates the procedures for the negotiation, arbitration, and approval of an interconnection agreement that permits a new carrier's entry into the local telephone market. 47 U.S.C. § 252. Once an incumbent LEC receives a request for an interconnection agreement from a new carrier, the parties can negotiate and enter into a voluntary binding agreement without regard to the majority of the standards set forth in § 251 of the Act. 47 U.S.C. § 252(a). If the parties cannot reach an agreement by means of negotiation, after a set number of days, a party can petition a State commission, here the MPUC, to arbitrate unresolved open issues. 47 U.S.C. § 252(b)(1).

An interconnection agreement adopted by either negotiation or arbitration must be submitted for approval to the State commission. 47 U.S.C. § 252(e)(1). The State commission must act within 90 days after the submission of an agreement reached by negotiation or after 30 days of an agreement reached by arbitration. 47 U.S.C. § 252(e)(4). The State commission must approve or reject the agreement, with written findings as to any deficiencies. 47 U.S.C. § 252(e)(1).

### FCC Regulations

47 U.S.C. § 251(d)(1) directs the FCC to promulgate regulations implementing the Act's local competition provisions within six months of February 8, 1996. "Unless and until an FCC regulation is stayed or overturned by a court of competent jurisdiction, the FCC regulations have the force of law and are binding upon state PUCs [Public Utility Commissions] and federal district courts." *AT&T Communications of California v. Pacific Bell*, 1998 WL 246652, at *2 (N.D.Cal. May 11, 1998) (citing *Anderson Bros. Ford. v. Valencia*, 452 U.S. 205, 219–20, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981)). Review of FCC rulings is committed solely to the jurisdiction of the United States Court of Appeals pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a).

On August 8, 1996, the FCC issued its First Report and Order, which contains the Agency's findings and rules pertaining to the local competition provisions of the Act. *Iowa Utils., Bd.*, 120 F.3d at 792 (citing First Report and Order, *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499, CC Docket No. 96–98 (Aug. 8, 1996) ("First Report and Order")). Soon after the release of the First Report and Order, incumbent LECs and State Commissions across the country filed motions to stay the implementation of the Order, in whole or in part. The cases were consolidated in front of the Eighth Circuit. In *Iowa Utilities Board*, the Eighth Circuit decided that "the FCC exceeded its jurisdiction in promulgating the pricing rules regarding local telephone service." *Id.* The Eighth Circuit

also vacated the FCC's "pick and choose" rule as being incompatible with the Act. *Id.* at 801. Other provisions of the First Report and Order were upheld by the Eighth Circuit.

On August 8, 1996, the FCC also promulgated the Second Report and Order, which contains additional FCC comments and regulations concerning provisions of the Telecommunications Act of 1996 that were not addressed in the First Report and Order. *The People of the State of California v. FCC*, 124 F.3d 934, 939 (8th Cir.1997), *rev'd in part sub nom., AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Again many local exchange carriers and state commissions filed suit challenging the order. Several cases were combined in front of the Eighth Circuit, which issued another order addressing the FCC's rules. *Id.*

On January 25, 1999, the Supreme Court reversed a significant portion of the Eighth Circuit's decisions. *AT & T Corp. v. Iowa Utils. Bd.*, 119 S.Ct. at 721. The Supreme Court ruled that the FCC does have jurisdiction to implement local pricing rules and the FCC's rules governing unbundled access, with the exception of Rule 319, are consistent with the Act. *Id.* at 738. In addition, the Supreme Court upheld the FCC's "pick and choose" rule as a reasonable, and possibly the most reasonable, interpretation of § 252(i) of the Act. *Id.*

### Procedural History

In this case, AWS, a Commercial Mobile Radio Service ("CMRS"), sent a letter dated October 3, 1996, to U.S. West making a request for the partes to negotiate an Interconnection Agreement pursuant to the Act. (A1, Ex. 1). The parties failed to reach accord on all issues and AWS petitioned the MPUC for arbitration on March 7, 1997.(A1). In its Petition for Arbitration, AWS noted eleven open issues for arbitration. (A1; Petition for Arbitration at 7–23). On April 1, 1997, U.S. West submitted its response to the MPUC. (A7).

On April 17, 1997, the MPUC granted AWS's petition and established procedures for the arbitration. (A11; MPUC Order Granting Petition at 1–5). The MPUC referred the matter to the Office of Administrative Hearings [1] to designate an Administrative Law Judge (ALJ) to conduct the arbitration proceedings and issue a recommendation. (A11; MPUC Order Granting Petition at 4). In its order, the MPUC noted that the Minnesota Department of Public Service ("DPS") [2] and the Residential Utilities Division of the Office of the Attorney General ("RUD–OAG") [3] had a right under state law to intervene in all MPUC proceedings. (A11; MPUC Order Granting Petition at 6).

The MPUC ordered that: "The burden of production and persuasion with respect to all issues of material fact shall be on U.S. WEST. The facts at issue must be proven by a preponderance of the evidence. The ALJ, however, may shift the burden of production as appropriate, based on which party has control of the critical information regarding the issue in dispute." (A11; MPUC Order Granting Petition at 10). The MPUC reasoned that the federal Telecommunications Act and the Minnesota Telecommunications Act of 1995

1. The Office of Administrative Hearings is an independent state agency which employs administrative law judges to conduct impartial hearings on behalf of other state agencies. Minn.Stat. §§ 14.48 and 14.50.

2. The Minnesota Department of Public Service is a state agency charged with the responsibility of investigating utilities and enforcing state law governing regulated utilities, as well as enforcing the orders of the MPUC. The DPS is authorized to intervene as a party in all proceedings before the MPUC. Minn. Stat. § 216A.07.

3. The Attorney General of Minnesota is "responsible for representing and furthering the interests of residential and small business utility consumers through participation in matters before the Public Utilities Commission involving utility rates and adequacy of utility services to residential or small business utility consumers." Minn.Stat. § 8.33, subd. 2.

are designed to create competitive entry into the local telephone market and placing the burden of proof on U.S. West facilitates this purpose. (A11; MPUC Order Granting Petition at 10). The MPUC further explained that U.S. West controlled most of the key information relevant to the proceedings. (A11; MPUC Order Granting Petition at 10).

On May 2, 1997, AWS and U.S. West submitted a matrix of twelve key issues to ALJ Allen Giles and the MPUC. (A15). Those issues included:

1) Access to Service Agreements;

2) Points of Interconnection;

3) Pricing of Services;

4) Application of Access Charges;

5) Reciprocal Compensation/Symmetrical Compensation;

6) Access to Unbundled Network Elements;

7) Items Specific to Paging;

8) Access to Poles, Ducts, Conduits, and Rights of Way;

9) Reciprocal Compensation Effective Date and Rates;

10) Contract Language;

11) Service Quality Standards; and

12) Transit Traffic.

(A15; Positions on Key Issues at 1–7). US West withdrew from its original list of open issues Wide Area Inbound Calling; Access to Numbering Resources; Dialing Parity; and Procedure for Notice of Change, because those issues were no longer in dispute. (A15; Positions on Key Issues at 5).

ALJ Giles presided over the arbitration hearing on May 6 and 7, 1997. (A17–A19). Attorneys for U.S. West, AWS, and the DPS were present, as well as a member of the MPUC staff. (A17; ALJ Hearing Transcript at 2). Eight witnesses were called and various exhibits were entered. (A17–A19). AWS called Kerri M. Landeis, Director of External Affairs for AWS, (A20); Russell Thompson, Director of Net-

work Planning for AWS, (A22); and Dr. Thomas M. Zepp, economist and Vice-President of Utility Resources, Inc., (A25), as expert witnesses. (A17–A18). US West called Thomas G. Londgren, Director of the Minnesota Regulatory Group for U.S. West, (A28); Denyce Jennings, U.S. West's Manager of Wireless Interconnection, (A30); Craig Wiseman, a member of U.S. West's technical staff in the Interconnection Planning Group, (A18; ALJ Hearing at 261); and Dean Buhler, a member of U.S. West's technical staff in Information Technologies, (A18; ALJ Hearing at 312), as expert witnesses. (A17–A19). US West also submitted the rebuttal testimony of Robert Harris, Principal at the Law and Economics Consulting Group and Professor Emeritus of Business and Public Policy in the Haas School of Business, University of California, Berkeley. (A39). The DPS called Susan Peirce, Public Utilities Rates Analyst for the MPUC, as an expert witness. (A40, Ex. A). The parties, including the DPS, submitted post-hearing briefs. (A45–A50). On June 6, 1997, the ALJ issued a Report and Recommended Arbitration Decision. (A51).

In early June, both U.S. West and AWS filed exceptions to the Recommended Arbitration Decision. (A53); (A54). By letter dated June 11, 1997, the DPS noted no exceptions would be filed as the ALJ's recommendations were consistent with the positions advocated by the DPS. (A55). The MPUC heard a staff briefing and oral arguments on June 30 and July 2, 1997.(A57). Pursuant to its vote at the July 2 meeting, the MPUC issued its Order Resolving Arbitration Issues on July 30, 1998.(A58). In its Order, the MPUC took judicial notice of the stayed FCC rules and made the FCC methodologies part of the record. (A58; Order Resolving Arbitration Issues at 2). The MPUC ruled on the following issues:

1) Bill & Keep;

2) Interim Prices;

3) Compensation to AWS from Third-Party Carriers;

4) Compensation for Traffic Terminated at AWS' Mobile Switching Center (MSC);

5) Access Charges for Intra–Major Trading Area (MTA) Roaming Calls;

6) Compensation for Terminating Paging Calls;

7) Dedicated Paging Facilities;

8) The Effective Date for Reciprocal Compensation;

9) Rates to Be Applied Between Commencement of Reciprocal Compensation and the Issuance of an Order;

10) "Pick and Choose" Option;

11) Points of Interconnection;

12) Limitation on Distance as to Midspan Meet Point;

13) Collocation of AWS' Remote Switching Units (RSUs) and Digital Loop Carrier Systems (DLCs) at U.S. West's Premises;

14) The Definition of "Collocated Premises";

15) Denial of Access Due to Space Exhaustion;

16) Nondiscriminatory Access to Unbundled Network Elements;

17) Access to Operational Support Systems (OSS);

18) Remedies for Service Quality Violations;

19) Access to Poles, Ducts, Conduits, and Rights of Way;

20) Adoption of Proposed Contract as Template; and

21) Arbitration Costs.

(A58; Order Resolving Arbitration Issues at 4–33). The MPUC ordered the parties to submit a final contract, containing all the arbitrated and negotiated terms, no later that 30 days from the service date of the MPUC's Order. (A58; Order Resolving Arbitration Issues at 34). On August 27, 1997, the parties submitted a CMRS Interconnection Agreement in accordance with the Order, but expressly reserved all rights in connection with any future challenges to the Order. (A48; Letter of Mark Ayotte at 2). The parties were unable to resolve the issue of special construction for interconnection facilities and therefore submitted two alternative versions for the portion of the Agreement addressing that issue. (A48; Letter of Mark Ayotte at 2).

On August 11, 1997, AWS filed a Petition for Reconsideration. (A59). On September 18, 1997, the Petition for Reconsideration and the Proposed Contract came before the MPUC. (A66; Order Resolving Issues After Reconsideration at 1). On September 29, 1997, the MPUC issued its Order Resolving Issues After Reconsideration, Examining Interconnection Agreement, and Requiring Compliance Filing. (A66). In that Order, the MPUC granted in part and denied in part AWS' Petitions for Reconsideration; the MPUC was persuaded that the compensation rate for AWS-terminated traffic should be the tandem switching rate rather than calculated on a per call basis. (A66; Order Resolving Issues After Reconsideration at 3, 11). The MPUC also corrected an error in its calculation of prices. (A66; Order Resolving Issues After Reconsideration at 4). The MPUC adopted the language submitted by AWS concerning special construction for interconnection facilities as the final contract language. (A66; Order Resolving Issues After Reconsideration at 11). The MPUC required a few further amendments and modifications to the Agreement, such as the addition of a notice provision and a provision concerning U.S. West Dex. (A66; Order Resolving Issues After Reconsideration at 6–11). The MPUC found the rest of the agreement to be generally consistent with the federal Act, Minnesota law, and the public interest. (A66; Order Resolving Issues After Reconsideration at 6).

The MPUC ordered the parties to submit a final contract that complied with its Order within 30 days; the MPUC noted

that a final contract with the proposed modifications would meet all applicable legal requirements, and therefore would be approved and effective as of September 18, 1997. (A66; Order Resolving Issues After Reconsideration at 11). The final U.S. West–AWS Agreement was filed with the MPUC on October 30, 1997.(A68). On December 15 and March 4, 1998, the MPUC issued two memorandums noting that the parties filed an Agreement that complied with its Order of September 29, 1997.(A69); (A73).

On March 13, 1998, pursuant to 47 U.S.C. § 252(e)(6), U.S. West filed the instant action seeking review of the MPUC's Orders. US West alleges nine counts in its complaint: (1) Count I, the MPUC violated U.S. West's due process rights and the dictates of the Act and Minnesota law by placing the burden of proof on U.S. West; (2) Count II, the MPUC violated 47 U.S.C. §§ 252(b)(1) and (b)(4)(A) by considering issues not included in AWS' petition or U.S. West's response; (3) Count III, the MPUC violated 47 U.S.C. § 252(d)(2) and (d)(A)(ii) by treating AWS's Mobile Switching Center ("MSC") as a tandem switch for the purpose of compensation; (4) Count IV, the MPUC violated 47 U.S.C. § 251(c)(6) when it required U.S. West to collocate RSUs and DLCs on its premises; (5) Count V, the MPUC violated 47 U.S.C. § 252(i) by ordering the inclusion of a provision in the Interconnection Agreement referencing the "unsettled state of the law" concerning the "pick and choose" rule; (6) Count VI, the MPUC violated § 251(c)(2) when it ordered U.S. West to provide interconnection at any technically feasible point, even if construction is involved; (7) Count VII, the MPUC exceeded its authority when it imposed conditions on U.S. West Dex; (8) Count VIII, the MPUC exceeded its authority under § 252(b)(4)(C) and (c) of the Act when it imposed requirements not expressly contained in the Act or state law; and (9) Count IX, the MPUC violated the Takings Clause by taking U.S. West's property without just compensation.

## II. OPERATIONAL SUPPORT SYSTEMS AS AN OPEN ISSUE

US West argues that the MPUC improperly required U.S. West to provide AWS access to its operational support systems ("OSS"). US West alleges the MPUC had no authority to require this access because this was not an open issue before the MPUC.

■    Section 252(c) ("Standards for arbitration") states that:

> In *resolving by arbitration* under subsection (b) of this section *any open issues and imposing conditions* upon the parties to the agreement, a State commission shall-
>
> (1) ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title;
>
> (2) establish any rates for interconnection, services, or network elements according to subsection (d) of this section; and
>
> (3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.

47 U.S.C. § 252(c) (emphasis added). Standing alone, this provision could arguably be read as ambiguous concerning the MPUC's ability to impose any condition of its choosing. However, when read in conjunction with 47 U.S.C. § 252(b) ("Agreements arrived at through compulsory arbitration"), there is a clear indication that any condition that the MPUC decides to impose on the agreement must relate to an "open issue," that is an issue raised by the parties themselves. Section 252(b)(4)(A) states that "[t]he State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) to the issues set forth in the petition and in the response, if any . . . ." This subsection indicates that the MPUC cannot indepen-

dently raise an issue not raised by one of the parties. This interpretation is further reinforced by subsection (b)(4)(C) which states that "[t]he State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) of this section upon the parties to the agreement ...." In this context, the imposition of conditions is expressly limited to resolving open issues. Therefore, § 252(c) cannot be read as a grant of authority to a state commission to impose any requirement of its choosing; under § 252(c) state commissions are limited to arbitrating open issues.

The MPUC and AWS argue, in turn, that the issue of access to unbundled network elements was clearly before the MPUC as an open issue and that because the OSS is a network element to be made available to new entrants on an unbundled basis according to 47 C.F.R. § 15.319, the issue of access to the OSS was also clearly before the MPUC.

After the MPUC issued its order and the parties submitted their briefs in this case, the Supreme Court vacated § 15.319. *AT&T Corp.,* —— U.S. at ——, 119 S.Ct. at 736. The Supreme Court stated that the FCC, in determining which network elements an incumbent LEC must make available, should give greater weight to the terms "necessary" and "impair" in § 252(d)(2). *Id.* The issue of access to OSS was an open issue only to the extent it could be considered a network element to be made available on an unbundled basis. In light of the Supreme Court's decision vacating 47 C.F.R. § 15.319, whether OSS can be considered an unbundled network element is now in doubt and § 15.319 cannot serve as the basis for its being considered such. Because the singular basis asserted by the MPUC for its considering access to OSS an open issue has now

been removed by the Supreme Court, this Court concludes that the MPUC lacked authority under § 252(c) to require U.S. West to make access to its OSS available to AWS. This issue is remanded to the MPUC for further consideration in light of this Order.[4]

## III. TANDEM TRANSPORT AND TERMINATION

US West argues that a provision of the Agreement imposed by the MPUC unlawfully compensates calls terminated at AWS's MSC at the tandem switching rate. US West alleges that the MPUC failed to consider actual function, that is that the MSC actually operates like an end-office switch rather than a tandem switch, in making its determination.

Section 251(b)(5) of the Act directs that all local exchange carriers are obligated to establish reciprocal compensation arrangements for the transport and termination of telecommunications. 47 U.S.C. § 251(b)(5). The terms and conditions for reciprocal compensation must be just and reasonable and, to meet this standard, they must allow for the recovery of a reasonable approximation of the "additional cost" of transporting and terminating a call begun on another carrier's network. 47 U.S.C. § 252(d)(2)(A). The FCC found that the "additional cost" will vary depending on whether or not a tandem switch is involved. First Report and Order, ¶ 1090. The FCC, therefore, determined that state commissions can establish transport and termination rates that vary depending on whether the traffic is routed through a tandem switch or directly to a carrier's end-office switch. *Id.* The FCC directed state commissions to "consider whether new technologies (e.g. fiber ring or wireless networks) perform functions similar to those performed by an incumbent LEC's

4. As was noted by the Eastern District of North Carolina, the Act does not explain what should occur if a district court finds that an Interconnection Agreement violates the Act. *AT & T Communications of the Southern*

*States, Inc. v. BellSouth Telecommunications, Inc.,* 7 F.Supp.2d 661, 668 (E.D.N.C.1998). Given the appellate nature of the proceeding, a remand to the state commission is the most appropriate option. *Id.*

tandem switch and thus, whether some or all calls terminating on the new entrant's network should be priced the same as the sum of transport and termination via the incumbent LEC's tandem switch." *Id.* The FCC further instructed that where the new carrier's switch serves a geographic area comparable to that served by the incumbent LEC's tandem switch, the appropriate proxy for the new carrier's costs is the LEC tandem interconnection rate. First Report and Order, ¶ 1090; 47 C.F.R. § 51.711(a)(3).[5] Therefore, in order to evaluate whether a switch performs as a tandem switch, it is appropriate to look at both the function and geographic scope of the switch at issue.

Whether a switch performs as a tandem or end-office switch is a factual determination that has been expressly delegated to the state commissions by the FCC. Because this is a question of fact, the MPUC's determination is reviewed using the arbitrary and capricious standard of review. *AT & T Communications of the Midwest, Inc. v. Contel of Minnesota,* No. 97–901 ADM/JGL, slip op. at 10–11 (D.Minn. April 30, 1998) (order denying motions to dismiss and determining standard of review); *see TCG Milwaukee, Inc. v. Public Service Commission of Wisconsin,* 980 F.Supp. 992, 1004 (W.D.Wis.1997).

The fundamental technical differences between wireless and landline telephone systems greatly complicate the comparison of the functions of their component elements. It is to some extent like comparing the proverbial apples and oranges.

Russell Thompson, Director of Network Planning for the Western Region of AWS, testified that the MSC performs duties similar to both a tandem and an end-office switch. (A23; Rebuttal Testimony of Russell Thompson at 1). Thompson described landline networks as being characterized by hierarchical switching centers with both tandem and end-office switches often being involved in the routing of calls. (A23; Rebuttal Testimony of Russell Thompson at 2). Wireless networks were explained as being hierarchical involving IS 41 Tandems, Cell Site Control ("CSC") switches, and cell sites in the routing of calls. (A23; Rebuttal Testimony of Russell Thompson at 2). The IS 41 and CSC are both located in the MSC. (A23; Rebuttal Testimony of Russell Thompson at 2). The CSC switches and cell sites together perform end office-like functions, (A23; Rebuttal Testimony of Russell Thompson at 7–8), while the IS 41 Tandem provides tandem-switch functions. (A23; Rebuttal Testimony of Russell Thompson at 3). "[T]andem switching systems perform trunk switching and generally provide two basic network functions—traffic concentration and centralization of services." (A23; Rebuttal Testimony of Russell Thompson at 9 (citing BOC Notes on Network, Section 4, Network Design and Configuration, 4.1.3.3, Tandem Switching Systems, pp. 4–6)). Thompson testified that the IS 41 Tandem performs both these functions. (A23; Rebuttal Testimony of Russell Thompson at 9).

Thomas Zepp, economist and Vice President of Utility Resources, Inc., confirmed Thompson's assessment that the MSC functions as a tandem switch. (A25; Direct Testimony of Thomas Zepp at 38–41). Zepp gave a number of examples as to how a MSC performs tandem functions, for example storing the location of and tracking a wireless customer in a "Home Location Register," routing calls to another MSC while a customer is in transit, and routing phone calls to a landline in the most cost-effective manner. (A25; Direct Testimony of Thomas Zepp at 38–40).

US West, in turn, presented strong evidence that the MSC functions as an end-

---

**5.** The Eighth Circuit vacated 47 C.F.R. § 51.711(a)(3) on the ground that the FCC lacked jurisdiction to issue pricing rules. *Iowa Utils. Bd.,* 120 F.3d at 800, 819 n. 39. However, the Supreme Court reversed this determination and reinstated the FCC's pricing rules, including 47 C.F.R. § 51.711, finding that "the Commission has jurisdiction to design a pricing methodology." *AT&T Corp.,* 119 S.Ct. at 733.

office switch rather than a tandem switch. (A42; Direct Testimony of Craig Wiseman at 9). US West's expert Craig Wiseman, a member of U.S. West's technical staff in the Interconnection Planning Group, testified that the MSC only connected AWS subscribers to each other or to other local service provider networks in order to deliver calls to or receive calls from AWS subscribers. (A42; Direct Testimony of Craig Wiseman at 9). AWS depends on U.S. West tandems to send calls to or receive calls from the vast majority of subscribers in Minnesota and the rest of the United States. (A42; Direct Testimony of Craig Wiseman at 9). Wiseman also testified that other wireless companies, such as GTE Mobilenet, SouthWestco, and Aliant, had recognized their switching offices as end offices in arbitrated agreements, and that other state arbitration panels had determined that wireless companies are not entitled to tandem switching and transport compensation. (A42; Directory of Craig Wiseman at 13).

On the issue of the geographic scope of the switches, there was evidence that the MSC serves a geographic area similar to that of a landline tandem switch. US West's tandem switches are limited by the LATA[6] boundaries in Minnesota and therefore there are several tandem switches within the state. (A18; ALJ Hearing at 209–10). AWS' MSC directly serves sixty-six percent of Minnesota's population. (A17; ALJ Hearing at 33). Although percentage of population is not precise as to geographic area covered, it indicates that the MSC covers at least an area comparable to one of Minnesota's LA-TAs and therefore covers an area comparable to a U.S. West tandem switch. US West argues that AWS' MSC fails to reach the same geographic area as all of U.S. West's tandem switches. (A42; Direct Testimony of Craig Wiseman at 11–12). However, that comparison is irrelevant. The issue is not whether the MSC covers the same geographic area as all of the tandem switches in Minnesota, but rather whether it covers the same geographic area as *one* tandem switch.

■ Based on the evidence before the ALJ and the MPUC, it appears that the MSC performs functions comparable to both end-office and tandem switches. Although there was conflicting evidence concerning the function of the MSC, the testimony of Thompson and Zepp provided a sufficient basis for the MPUC's finding that the MSC performs a tandem switch function.[7] This is particularly true in light of the FCC's admonition to consider the capabilities of new technology such as wireless networks. While there may be no exact corollaries between the wireless and landline systems, there is evidence to suggest that the MSC has capabilities and reach that are of a certain equivalence to a tandem switch. The evidence also indicates that the MSC covers a geographic area comparable to that covered by a tandem switch. Pursuant to the FCC rules, this alone provides sufficient grounds for a finding that the appropriate rate for the MSC is the tandem switch rate.[8]

The MPUC's finding that calls terminated at AWS's MSC should be compensated

6. A Local Access and Transport Area ("LATA") is "a contiguous geographic area" established by a Bell operating company pursuant to a consent decree. 47 U.S.C. § 153(25). Generally a state will have more than one LATA.

7. US West indicated that the MPUC should have been limited by the definition of tandem switch found in 47 C.F.R. § 51.319(c)(2). However, since the MPUC made its decision, 47 C.F.R. § 51.319 was vacated by the Supreme Court. *AT&T Corp.*, 119 S.Ct. at 736.

US West's argument is now moot in light of the Supreme Court's recent decision.

8. The MPUC stated that it did not base its final decision on FCC Rule 51.711(a)(3) and the geographic reach of the switches, although its preliminary ruling may have taken geographic reach into consideration. (MPUC's Brief at 4). Even though the MPUC may not have relied on FCC Rule 51.711(a)(3), the reinstated rule and the comparable geographic reach of the switches reinforces the MPUC's final decision.

at the tandem switching rate is not arbitrary and capricious.

### IV. COLLOCATION OF EQUIPMENT

US West argues that the MPUC erred by requiring U.S. West to permit AWS to physically collocate RSUs on U.S. West's premises because such equipment is not necessary for access to unbundled network elements under § 251(c)(6).[9]

Section 251(c)(6) states that an incumbent LEC has a duty to provide "for physical collocation of equipment *necessary* for interconnection or access to unbundled network elements at the premises of the local exchange carrier .... " 47 U.S.C. § 251(c)(6) (emphasis added). The FCC found that § 251(c)(6) "generally requires that incumbent LECs permit the collocation of equipment used for interconnection or access to unbundled network elements." First Report and Order, ¶ 579. In reaching that conclusion, the FCC interpreted and defined the term "necessary": "Although the term 'necessary,' read most strictly, could be interpreted to mean 'indispensable,' we conclude that for the purposes of section 251(c)(6) 'necessary' does not mean 'indispensable' but rather 'used' or 'useful.' " *Id.* The FCC decided that a more expansive interpretation of the term "necessary" would further the competitive motivation behind the Act. *Id.*

The FCC then determined whether specific equipment could or could not be collocated on the incumbent LEC's premises, essentially deciding whether the equipment is "useful" for interconnection or access to unbundled elements. *Id.* ¶ 580–82. Concerning the collocation of switching equipment, the FCC stated:

At this time, we do not impose a general requirement that switching equipment be collocated since it does not appear that it is used for the actual interconnection or access to unbundled network elements. We recognize, however, that modern technology has tended to blur the line between switching equipment and multiplexing equipment, which we permit to be collocated. We expect, in situations where the functionality of a particular piece of equipment is in dispute, that state commissions will determine whether the equipment at issue is actually used for interconnection or access to unbundled elements.

*Id.* ¶ 581. The FCC left the factual determination as to whether "switching equipment" is used for interconnection to the discretion of the state commissions.

When allotting the burden of proof, the FCC placed the burden on the incumbent LEC to prove that specific equipment is not "necessary," meaning useful, for interconnection to unbundled network elements. *Id.* ¶ 580. In explaining this standard, the FCC stated that:

[W]henever a telecommunication carrier seeks to collocate equipment for purposes within the scope of Section 251(c)(6), the incumbent LEC shall prove to the state commission that such equipment is not "necessary," as we have defined that term, for interconnection or access to unbundled network elements.

*Id.* ¶ 580.

In addition to defining "necessary" in the context of § 251(c)(6), the FCC also interpreted the term "necessary" in relation to § 251(d)(2).[10] The FCC deter-

---

9. US West briefed only the issue of collocating RSUs, although its complaint referenced both RSUs and DLCs in connection with this issue.

10. 47 U.S.C. § 251(d)(2) provides:

In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Com-

mission shall consider, at a minimum, whether-
(A) access to such network elements as are proprietary in nature is *necessary;* and
(B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer. (emphasis added).

mined that within the context of § 251(d)(2) the term "necessary" means "that an element is a prerequisite for competition." First Report and Order, ¶ 282. Without a necessary element, a new entrant's "ability to compete would be significantly impaired or thwarted." *Id.* The FCC stated that finding that a proprietary element is not "necessary" for purposes of § 251(d)(2)(A), requires an incumbent LEC to establish that "a new entrant could offer the same proposed telecommunications service through the use of other, nonproprietary unbundled elements within the incumbent's network." *Id.* ¶ 283. The FCC would view the "necessary" requirement as having been met even if the " 'requesting carriers can obtain the requested proprietary element from a source other than the incumbent,' " since " ' [r]equiring new entrants to duplicate unnecessarily even a part of the incumbent's network could generate delay and higher costs for new entrants, and thereby impede entry by competing local providers and delay competition, contrary to the goals of the 1996 Act.' " *AT&T Corp.*, 119 S.Ct. at 735 (citing First Report and Order, ¶ 283). By means of these lexicographical permutations, the FCC created a similar definition for the term "necessary" within the context of § 251(d)(2) and § 251(c)(6); in both cases, the word means something akin to "useful."

In *AT & T Corp.*, the Supreme Court vacated the FCC's interpretation of the word "necessary" within the context of § 251(d)(2), finding that the FCC had given the term too broad a definition and robbed it of all of its teeth as a limiting standard. *AT&T Corp.*, 119 S.Ct. at 736. The Court stated that "the Act requires the FCC to apply some limiting standard, rationally related to the goals of the Act, which it has simply failed to do." *Id.*

■ By rejecting the FCC's definition of the term "necessary" within the context of § 251(d)(2), the Supreme Court implicitly rejected the same overly broad definition given to the word by the FCC in relation to § 251(c)(6). "Presumptively, 'identical words used in different parts of the same act are intended to have the same meaning.' " *United States National Bank of Oregon v. Independent Insurance Agents of America*, 508 U.S. 439, 460, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quoting *Commissioner v. Keystone Consol. Industries, Inc.*, 508 U.S. 152, 159, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993)). As "necessary" does not mean "useful" in the context of § 251(d)(2), it cannot mean "useful" in § 251(c)(6). In making its factual determination about whether to permit the collocation of RSUs, the MPUC utilized the "used" or "useful" standard originally promulgated by the FCC.[11] In light of the rejection of this standard by the Supreme Court, collocation must be remanded to the MPUC for redetermination using a more stringent meaning of the term "necessary."

## V. *"PICK AND CHOOSE" PROVISION*

In its reply brief, U.S. West seeks to withdraw, without prejudice, its Count V request for declaratory relief concerning AWS's rights under § 252(i)'s most favored nation provision. (Pl.'s Reply Brief at 1 n. 1). Therefore, the Court will dismiss Count V without prejudice. It should be noted, however, that in light of the recent Supreme Court ruling, the provision concerning § 252(i) that the MPUC chose now seems prescient.

11. In its Order, the MPUC stated that it will allow the collocation of RSUs and DLCs on U.S. West's premises "[c]onsistent with its reasoning and action in the Consolidated Arbitration Order." (A58; Order Resolving Arbitration Issues at 22). In the Consolidated Arbitration Order, the MPUC ordered collocation of RSUs and DLCs based on U.S. West's failure "to meet its burden of proving that these types of equipment are not *'necessary,' as interpreted by the FCC*, for interconnection or access to unbundled elements." (A168 from *US West Communications, Inc. v. Garvey*, No. 97–913 ADM/AJB; Consolidated Arbitration Order at 16) (emphasis added).

## VI. INTERCONNECTION AT ANY TECHNICALLY FEASIBLE POINT

The MPUC ruled that U.S. West must build facilities necessary for AWS to connect to U.S. West's network at any technically feasible point of AWS's choosing. (A66; Order Resolving Issues After Reconsideration at 7).[12] The MPUC approved the following language in the U.S. West–AWS Agreement: "USWS shall provide the facilities and arrangements herein described to AWS in order to establish the physical connection and permit the interchange of traffic between the Parties, as well as any other facilities AWS may require for operation of AWS's System." (A68; CMRS Interconnection Agreement at § 2.B). The MPUC also approved § 2.D of the Agreement, which would require U.S. West to build a DS1 or DS3 facility any place where one is not available. (A68; CMRS Interconnection Agreement at § 2.D).

US West claims that the MPUC erred when it required U.S. West to construct new facilities. US West argues that this requirement over extends the Act's directive that incumbent LECs need to provide interconnection "that is at least equal in quality to that provided by the local exchange carrier to itself." 47 U.S.C. § 251(c)(2)(C).

The MPUC claims that § 251(c)(2)(C) is not controlling and urges that the focus should instead be on the Act's directive that incumbent LECs must provide interconnection to new entrants "at any technically feasible point within the [incumbent] carrier's network." 47 U.S.C. § 251(c)(2)(B). In support of the MPUC's ruling that U.S. West must build facilities, AWS similarly cites to § 251(c)(2)(B), as well as relying on the FCC's order stating that "the obligations imposed by sections 251(c)(2) and 251(c)(3) include modifications to incumbent LEC facilities to the extent necessary to accommodate intercon-

nection or access to network elements." First Report and Order, ¶ 198.

Section 251(c)(2) states that an incumbent LEC has:

The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network-

(A) for the transmission and routing of telephone exchange service and exchange access;

(B) at any technically feasible point within the carrier's network;

(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; . . .

47 U.S.C. § 251(c)(2). The FCC originally interpreted § 252(c)(2)(C) as requiring incumbent LECs to provide superior quality interconnection when such interconnection was requested by new entrants. *Iowa Utils. Bd.*, 120 F.3d at 812. The Eighth Circuit, however, vacated this FCC interpretation of § 251(c)(2)(C), finding that it was not supported by the Act's language. *Id.* The Eighth Circuit explained that:

Although we strike down the Commission's rules requiring incumbent LECs to alter substantially their networks in order to provide superior quality interconnection and unbundled access, we endorse the Commission's statement that "the obligations imposed by sections 251(c)(2) and 251(c)(3) include modifications to incumbent LEC facilities to the extent necessary to accommodate interconnection or access to network elements."

*Id.* at 813 n. 33 (quoting First Report and Order, ¶ 198). The Eighth Circuit specifically upheld the FCC's definition of the term "technically feasible" from § 251(c)(2)(B). *Id.* at 810. In defining "technically feasible," the FCC stated:

12. The parties do not dispute that AWS would

pay for the construction of any new facilities.

Interconnection, access to unbundled network elements, collocation, and other methods of achieving interconnection or access to unbundled network elements at a point in the network shall be deemed technically feasible absent technical or operational concerns that prevent the fulfillment of a request by a telecommunications carrier for such interconnection, access, or methods. A determination of technical feasibility does not include consideration of economic, accounting, billing, space, or site concerns, except the space and site concerns may be considered in circumstances where there is no possibility of expanding the space available. The fact that an incumbent LEC must modify its facilities or equipment to respond to such request does not determine whether satisfying such request is technically feasible.

47 C.F.R. § 51.5.

In reaching its decision concerning the construction of facilities, the MPUC stated that the issue was not whether AWS can demand a superior quality interconnection, but rather whether U.S. West can be required to modify its network to permit interconnection at existing quality levels. (A66; Order Resolving Issues After Reconsideration at 7). The MPUC did not rely on the FCC's vacated interpretation of § 251(c)(2)(C), but rather what it considered to be the FCC's upheld interpretation of § 251(c)(2)(B).

The MPUC is correct that construction of a new facility does not necessarily mean superior interconnection. New facilities could be necessary just to create equivalent quality interconnection and access. Therefore, in making its ruling, the MPUC did not violate § 251(c)(2)(C).

The question therefore becomes did the MPUC have the power under § 251(c)(2)(B) to order U.S. West to provide new facilities upon request or did the construction of new facilities exceed the modifications envisioned by the FCC in its interpretation of "technically feasible."

The answer is dependent on whether the concept of modifying facilities is interpreted broadly or narrowly. Three factors favor a broad construction. First, the FCC stated that site concerns should not be determinative of technical feasibility except to the extent space could not be expanded. In this statement that site concerns should not be determinative, there is an implication that the parties should look beyond any specific site, e.g. to new facilities, when resolving interconnection issues. In addition, construction of new facilities falls under the rubric of space expansion and therefore ensures technical feasibility. Second, so long as the new entrant pays for the costs associated with the new facility, the incumbent LEC should not be unduly burdened. Third, the purpose of the Act is to promote the opening up of local telephone markets to competition in a speedy manner. Because the incumbent LEC has the relevant expertise and knowledge for building facilities to interconnect with its network, it would be expedient to require it to build the facilities.

Based on the foregoing, the Court concludes that the MPUC had the necessary authority under § 251(c)(2)(B) to order U.S. West to provide new facilities on request.

## VII.  *US WEST DEX*

US West claims the MPUC exceeded its authority when it rejected the parties' agreement to defer directory and yellow page issues to later negotiations and instead required the parties to adopt a provision that regulated U.S. West Dex. U.S. West argues that the MPUC does not have the authority, under either state law or the Act, to impose obligations on U.S. West Dex.

In response, the MPUC and AWS claim that the Commission did not directly regulate U.S. West Dex. They argue that the MPUC did what it was required to do by the Act, ensure that AWS had nondiscriminatory access to telephone numbers and

listings, and that U.S. West provide AWS with services that are "at least equal in quality to that provided by the incumbent LEC to itself." First Report and Order, ¶ 970.

US West Communications, Inc., the party in this case, and U.S. West Dex are wholly owned subsidiaries of U.S. West, Inc. ("US West Parent"). *MCI Telecomms. Corp. v. U.S. West Communications, Inc.,* Case No. C97–1508R, at 23–24 (July 21, 1998 W.D.Wash.). US West Dex is the publishing branch of the parent company and publishes U.S. West's white and yellow page directories. *Id.* at 24. US West Dex is not a named party to the underlying Agreement in this case.

Contrary to the MPUC's and AWS's argument, the Commission did regulate U.S. West Dex. The MPUC required the parties to include language in the Agreement that placed a direct obligation on U.S. West Dex: "US WEST Dex will give the Carrier the same opportunity to provide directory listings as it provides to U.S. WEST (for example, through some type of bidding process)." (A56; Order Denying Reconsideration at 11). While other portions of the MPUC's Order were explicitly directed only at U.S. West, the MPUC did seek to control U.S. West Dex's business and contract agreements, and therefore to regulate U.S. West Dex: "US WEST shall make its contracts with U.S. WEST DEX available for review by the Carrier, as necessary, to ensure that the Carrier is receiving the same services at the same terms as U.S. WEST." (A56; Order Denying Reconsideration at 11). The question becomes whether the MPUC had the authority to regulate U.S. West Dex under either state law or the Act, or whether it assumed authority it never had as the Plaintiff claims.

■ Under state law, the MPUC has only the "powers expressly delegated by the legislature and those fairly implied by and incident to those expressly delegated." *In the Matter of Northwestern Bell Telephone Co.,* 371 N.W.2d 563, 565 (Minn.Ct. App.1985) (citing *Great Northern Railway Co. v. Public Service Comm'n,* 284 Minn. 217, 169 N.W.2d 732, 735 (1969)). Implied powers must be fairly evident from the express powers. *Id.* (quoting *Peoples Natural Gas Co. v. Minnesota Public Utilities Comm'n,* 369 N.W.2d 530 (Minn.1985)). As the Minnesota Supreme Court held, Chapter 237 was created to resolve issues concerning public utility telephone companies; a business that publishes directories is not a telephone company and therefore does not fall under the regulatory powers of the MPUC. *In the Matter of Northwestern Bell Telephone Co.,* 367 N.W.2d 655, 660 (Minn.App.1985). US West, as a utility, is regulated by the MPUC, while U.S. West Dex, which is in the business of publishing directories, is not. *See id.* The MPUC does not have the power under state law to regulate U.S. West Dex. The Court must therefore analyze federal law as the possible basis of authority for the MPUC's action regulating U.S. West Dex.

■ The Act states that local exchange carriers have the duty to provide competitors with nondiscriminatory access to telephone numbers, directory assistance, and directory listings. 47 U.S.C. § 251(b)(3). US West Dex is not a local exchange carrier because it does not engage in providing telephone exchange service or exchange access. *See* 47 U.S.C. § 153(26). As U.S. West Dex is not a covered entity under the Act, the MPUC cannot use the statute to regulate U.S. West Dex or impose an obligation on it. *See MCI Telecomms, Corp. v. U.S. West Communications, Inc.,* Case No. C97–1508R, at 25 (July 21, 1998 W.D.Wash.).[13]

13. The FCC concluded that the term "directory listings" encompasses directory listings published by a telecommunication carrier and its "affiliates," but then never defines the term "affiliate." 47 C.F.R. § 51.5. Given the

Act's express limitation of covered entities to telecommunications carriers, a telecommunications carrier's control of an entity must be a prerequisite for finding that the entity is an affiliate within the meaning of the FCC's

■ Because it lacked the power under both state law and the Act to regulate U.S. West Dex, the MPUC exceeded its authority by ordering the addition of a provision to § 11 requiring U.S. West Dex to treat U.S. West and its competitors the same with respect to yellow page advertising and white page directory listings. These matters are remanded to the MPUC for further deliberations.

## VIII. *RECORDING AND BILLING SERVICES*

US West argues that the MPUC violated § 252(b)(4) and (c) by requiring U.S. West to make its recording and billing services available to AWS to facilitate AWS's collection of termination charges when a third party originates calls that transit U.S. West's network and are then terminated on AWS's network. US West argues that the MPUC did not have the authority under the Act to impose such a requirement.

AWS argues that the MPUC had the necessary authority under § 252(b)(4)(C) as well as § 251(b)(5). The MPUC argues that its authority derived from § 253(b) and state law.

After a request for negotiations has been made, the parties have a duty to negotiate an Interconnection Agreement pursuant to § 251 of the Act. 47 U.S.C. § 252(a)(1). During their negotiations, the parties are not bound by the directives of subsections (b) and (c) of § 251. *Id.* Essentially, the parties can create an Interconnection Agreement of their choosing that covers any desired aspect of interconnection. In their discussions, the parties are not limited to those matters explicitly enumerated in § 251 or the FCC's rules. If the parties are unable to resolve the issues that formed the subject of their negotiations, § 252(b)(1) provides that a party "to the negotiation may petition a State commission to arbitrate *any* open

issues." (emphasis added). The parties can bring any unresolved interconnection issue before the state commission for arbitration. The parties are again not limited to issues explicitly enumerated in § 251 or the FCC's rules, but rather are limited to the issues which have been the subject of negotiations among themselves.

Section 252(b)(4)(C) provides the authority for a state commission to act during arbitration proceedings, "[t]he State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) of this section upon the parties to the agreement . . . ." Section 252(c) ("Standards for arbitration") states that:

> In resolving by arbitration under subsection (b) of this section any open issues and imposing conditions upon the parties to the agreement, a State commission shall—
>
> > (1) ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title;
> >
> > (2) establish any rates for interconnection, services, or network elements according to subsection (d) of this section; and
> >
> > (3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.

47 U.S.C. § 252(c).

■ Section 252(b)(4)(C) expressly provides that a state commission "*shall* resolve *each* issue set forth in the petition and the response." If an issue has been designated by the parties as in need of resolution by the MPUC, the MPUC has an obligation to address that issue and, as was noted above, the parties may raise any issue concerning which they have attempt-

rules. Although U.S. West and U.S. West Dex share a parent company that does not equate to exerting control over one another. With-

out some evidence of U.S. West's control of U.S. West Dex, the Court cannot conclude that U.S. West Dex is an affiliate of U.S. West.

ed to negotiate a resolution. The language of § 252(c)(1) stating that the state commission shall ensure that the resolution of open issues meets the requirements of § 251, does not confine the resolution of the issues to the requirements of § 251. If a state commission ensures that the resolution meets the requirements of a section, it is merely certifying that the resolution meets the affirmative requirements of the section while simultaneously determining that it does not conflict with or violate the section's affirmative and negative requirements. Not every issue included in the resolution necessarily involves the affirmative requirements of § 251. Thus, the only limitations that § 252(b)(4)(C) and (c) place upon any individual issue addressed by a state commission during arbitration are that the issue must be: (1) an open issue and (2) that resolution of the issue does not violate or conflict with § 251.

■ Transit traffic was an issue presented by the parties to the ALJ and the MPUC in their matrix of twelve key issues. (A15; Positions on Key Issues at 5). As part of the transit traffic issue, the parties discussed including transit traffic as part of their "bill and keep" arrangement. AWS argued that it should be part of the arrangement and U.S. West argued that it would not be appropriate to include it because transit traffic does not involve a U.S. West customer originating the call. (A15; Positions on Key Issues at 5). The billing of transit traffic was an open issue between the parties and was expressly presented to the MPUC for resolution. Furthermore, as the billing of transit traffic is not expressly addressed by § 251 or the FCC rules, the MPUC's decision to require U.S. West to make its recording and billing services available to AWS does not conflict with or violate § 251. Because this issue met the two requirements of § 252(b)(4)(C) and (c), the MPUC had the authority under the Act to resolve this open issue.

## IX. BURDEN OF PROOF

The MPUC created the following burden of proof for the parties: "The burden of production and persuasion with respect to all issues of material fact shall be on U.S. WEST .... The facts at issue must be proven by a preponderance of the evidence. The ALJ, however, may shift the burden of production as appropriate, based on which party has control of the critical information regarding the issue in dispute." (A3) (MPUC Order Granting Petition at 10).

■ When Congress establishes the burden of proof or production to be applied in an administrative proceedings, the courts must defer to Congress. *Steadman v. S.E.C.*, 450 U.S. 91, 95–96, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). However, when Congress is silent as to the issue, it is left to the judiciary to resolve the question. 450 U.S. at 95, 101 S.Ct. at 1004.

The provisions of the Act and the FCC rules, which address the issue, place the burden of proof on the incumbent LEC. *See* 47 C.F.R. §§ 51.5 ("An incumbent LEC that claims that it cannot satisfy such request because of adverse network reliability impacts must prove to the state commission by clear and convincing evidence that such interconnection, access, or methods would result in specific and significant adverse network reliability impacts.") and 51.321(d) ("An incumbent LEC that denies a request for a particular method of obtaining interconnection or access to unbundled network elements on the incumbent LEC's network must prove to the state commission that the requested method of obtaining interconnection or access to unbundled network elements at that point is not technically feasible."). There appears to be no section of the Act or FCC rules that places the burden of proof on the new entrant. The MPUC has admittedly placed a heavy burden of proof on the incumbent LEC, but no evidence has been adduced that such a standard conflicts

with the Act or the FCC rules.[14] To the extent Congress and the FCC have spoken to the burden of proof, the MPUC's position does not conflict with their directives.

As for the burden of proof for the remainder of the statute, normally when a federal statute is silent as to the burden of proof in an administrative proceeding, a court would turn to the Administrative Procedure Act (APA) to fill the void. However the APA does not apply to these proceedings because the MPUC is not a federal agency. *Franklin v. Massachusetts*, 505 U.S. 788, 800, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). Typically an applicable state statute would determine the proper burden of proof for proceedings before a state agency like the MPUC. In fact, U.S. West argues that the MPUC should have applied the burden of proof for contested case proceedings found in Minnesota Rule 1400.7300, subp. 5. However, because this is a *sui generis* proceeding, a state agency applying federal law to review telecommunications agreements, at the time of the hearing there was no state law explicitly on point.[15] The MPUC was thus left the task of developing an appropriate burden of proof.

The burden of proof the MPUC selected is in accord with the procompetitive purposes of the Act and realistically reflects the parties access to and control of information. Generally, under federal and Minnesota common law, the proponent of an issue—that is the one who wants to prove the affirmative—has the burden of proof as to that issue. *Newport News Shipbuilding and Dry Dock Co. v. Loxley*, 934 F.2d 511, 516 (4th Cir.1991) (citing *Selma, Rome & D. Railroad v. United States*, 139 U.S. 560, 567, 11 S.Ct. 638, 35

L.Ed. 266 (1891); *Fleming v. Harrison*, 162 F.2d 789, 792 (8th Cir.1947)); *Holman v. All Nation Insurance Co.*, 288 N.W.2d 244, 248 (Minn.1980). However, under both federal and Minnesota common law, questions of fairness, such as the control of information, can alter the disposition of the burden of proof. *Fleming*, 162 F.2d at 792; *Holman*, 288 N.W.2d at 248.

▇ In this case, placing the burden of proof on the competitive local exchange carrier ("CLEC") would present an insurmountable barrier to entry into the local telephone market. As the MPUC accurately noted, U.S. West has held a monopoly in the local telephone market for an extended period of time and as a result largely controls the information about the market. It knows the operation and function of various component elements of its system as well as the costs involved. Thus, fairness supports leveling the playing field by allocating the burden of proof onto the incumbent LEC, the party with the historical advantage.

In addition, the burden of proof established by the MPUC permits for the shifting of the burden in appropriate circumstances, e.g. when the CLEC controls the relevant information. Flexibility is provided to accommodate situations where it would be unjust to leave the burden of proof on the incumbent LEC. Given this flexibility and in light of the control of information as well as the purpose of the Act, the burden of proof standard chosen by the MPUC was appropriate.

## X. *TAKINGS CLAIM*

US West makes a general claim that if the U.S. West–AWS Agreement is upheld,

---

14. The one apparent exception involves the issue of technical feasibility of interconnection. The FCC rules create a clear and convincing standard in relation to this issue while the MPUC created a preponderance of the evidence standard. As this apparent conflict is not relevant to this case, it will not be addressed here.

15. After the hearing, the MPUC adopted Minnesota Rule 7812.1700, subp. 23 to govern the arbitration of intercarrier negotiations. Minnesota Rule 7812.1700, subp. 23 contains the same burden of proof as the one used by the MPUC in this case. Minnesota Statute § 237.16 authorized the MPUC to promulgate rules governing local competition and to define the procedures for competitive entry and exit. Minn.Stat. § 237.16, subd. 8.

it will result in a taking of U.S. West's property. US West also alleges that requiring U.S. West to permit collocation of RSUs, access to its OSS, and interconnection and access to unbundled elements is a physical occupation of its property, and therefore constitutes a *"per se* taking under the Fifth Amendment."

In relation to its takings claim, U.S. West states that it is not seeking compensation for the alleged taking but rather that it wishes an injunction to prevent a taking without just compensation. US West appears to be alleging a violation of the jurisdictional grant of the Act. In making its argument, U.S. West relies on *Bell Atlantic Tel. Cos. v. FCC,* 24 F.3d 1441 (D.C.Cir.1994). In *Bell Atlantic,* the D.C. Circuit determined that 47 U.S.C. § 201 did not vest the FCC with the necessary authority to order LECs to provide physical collocation of equipment upon demand. *Id.* at 1444–47. It found that because the particular statute did not expressly authorize an order of physical collocation, the FCC could not impose it. *Id.* at 1447. *Bell Atlantic* is, however, inapposite to the present case, because, unlike the general Communications statute at issue in *Bell Atlantic,* 47 U.S.C. § 251(c)(6) expressly provides for limitations being placed on the LECs' property rights, including the requirement that incumbent LECs have a duty to provide for the physical collocation of equipment. *See* 47 U.S.C. § 251(c)(6). In fact, Congress was aware of the *Bell Atlantic* decision when it authorized the imposition of physical collocation:

> Paragraph 4(B) [of section 251] mandates actual collocation, or physical collocation, of equipment necessary for interconnection at the premises of a LEC, except that virtual collocation is permitted where the LEC demonstrates that actual collocation is not practical for technical reasons or because of space limitations.... Finally, this provision is necessary to promote local competition, because a recent Court decision indicates that the Commission lacks the au-

thority under the Communications Act to order physical collocation. (*See Bell Atlantic Tel. Co. v. Federal Communications Commission,* 24 F.3d 1441 (1994)).

House Rep. No. 104–204, at 73 (1995). Therefore, Congress clearly intended to vest the agencies with authority to place limitations on the LECs' property rights.

US West has not only challenged the MPUC's authority to impose these limitations on U.S. West's property, but also claimed that the Agreement approved by the MPUC does not fully compensate U.S. West for the taking of its property. This is a traditional takings claim allegation and the Court will therefore apply a traditional takings claim analysis.

The defendants argue that U.S. West's taking claim must fail because: (1) it exceeds the scope of this Court's jurisdiction, which is limited by 47 U.S.C. § 252(e)(6); (2) the claim is not ripe for review; and (3) the agreement contains provisions which allow for full cost recovery by U.S. West.

■ The Eighth Circuit explicitly noted that a takings claim can be presented to a federal district court under the review provisions of subsection 252(e)(6). *Iowa Utils., Bd.,* 120 F.3d at 818. Therefore, this Court has jurisdiction to hear the takings claim.

■ In order for a takings claim to be ripe, two elements must be met: (1) the administrative agency has reached a final, definitive position as to how it will apply the regulation at issue, and (2) the plaintiff has attempted to obtain just compensation through the procedures provided by the State. *Williamson Co. Regional Planning v. Hamilton Bank,* 473 U.S. 172, 191, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Here, neither of these elements have been satisfied.

■ The Fifth Amendment states that, "private property [shall not] be taken for public use without just compensation." The Takings Clause is not meant to limit

the government's ability to interfere with an individual's property rights, but rather to ensure compensation when a legitimate interference that amounts to a taking occurs. *Glosemeyer v. Missouri–Kansas–Texas Railroad,* 879 F.2d 316, 324 (8th Cir.1989) (quoting *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)). The compensation does not have to precede the taking; a process for obtaining compensation simply has to exist at the time of the taking. *Id.* (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). If U.S. West ultimately receives just compensation then there has been no violation of the Takings Clause.

Public utilities, which have a hybrid public and private status, must be analyzed in a slightly different manner than other entities under the Takings Clause.[16] *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 307, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989).

The guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so "unjust" as to be confiscatory. *Covington & Lexington Turnpike Road Co. v. Sandford,* 164 U.S. 578, 597, 17 S.Ct. 198, 205–206, 41 L.Ed. 560 (1896) (A rate is too low if its is "so unjust as to destroy the value of [the] property for all the purposes for which it was acquired," and in so doing "practically deprive[s] the owner of property without due process of law"); *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942) ("By long standing usage in the field of rate regulation, the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense"); *FPC v. Texaco Inc.,* 417 U.S. 380, 391–392, 94 S.Ct. 2315, 2323, 41 L.Ed.2d 141 (1974) ("All that is protected against, in a constitutional sense, is that the rates

fixed by the Commission be higher than a confiscatory level"). *Id.* at 308, 109 S.Ct. 609. If the state fails to provide sufficient compensation, then the state has taken the use of a utility without just compensation and thereby violated the Takings Clause. *Id.* The particular theory used to determine whether a rate is fair does not matter. *Id.* at 310, 109 S.Ct. 609 (citing *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944)). If the overall effect cannot be said to be unreasonable then judicial inquiry is at an end. *Id.* (citing *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944)). Whether a rate is unfair depends on what is a fair rate of return given "the risks under a particular rate-setting system, and on the amount of capital upon which the investors are entitled to earn that return." *Id.* "Rates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid .…" *Hope Natural Gas,* 320 U.S. at 605, 64 S.Ct. 281.

■ The purpose of the Telecommunications Act of 1996 is, in part, to foster competition in the local telephone market. *GTE North, Inc. v. McCarty,* 978 F.Supp. 827, 831 (N.D.Ind.1997) (citing Joint Explanatory Statement of the Committee of Conference, H.R.Rep. No. 104–458, at 113 (1996)). Under the Act, U.S. West provides services to its competitors rather than the public. 47 U.S.C. § 251(c). The end goal is not a fair rate of return as in the traditional rate-setting paradigm, but rather the equitable opening up of a market. Neither party to the Agreement is expected to profit in the interconnection or resale processes. *See* 47 U.S.C. § 251(c)(4)(A) ("to offer for resale at wholesale rates …"). Because these transactions are not designed to be profit-

---

**16.** Although the traditional public utility rate model is not a perfect model for § 252(e)(6) cases, it is informative. *See* J. Gregory Sidak & Daniel F. Spulber, *Deregulatory Takings and Breach of the Regulatory Contract,* 71 N.Y.U. Law Rev. 851, 954 (Oct.1996).

able, the analysis cannot be fair rate of return as to any individual provision concerning the sale or access of services to the CLECs. Rather the query must be whether any provision or provisions of the Agreement negatively affect the *overall* operation of the incumbent LEC to such a degree that it can no longer receive a fair rate of return from its investment.

■ In this case, it is premature to ask this question for two reasons. First, the MPUC has not reached a final decision concerning the prices for unbundled elements; they are still subject to a true-up procedure at the end of the Generic Cost Investigation. Until the MPUC reaches a decision on that issue, the overall effect of the Agreement cannot be determined and the takings claim is not ripe for review. Second, the incumbent LEC still has an opportunity to have its public rates increased in light of the MPUC's Orders made pursuant to §§ 251 and 252. If U.S. West is not earning a sufficient return on its investment in Minnesota, it can petition the MPUC for a rate change. *See* Minn.Stat. § 237.075. The MPUC is obligated to implement a rate base upon which a telephone company can earn a fair rate of return. *See id.*, subd. 6. U.S. West will not have exhausted its state remedies until it has taken this final step. It would only be after such a hearing that a court could determine whether the overall utility rates are "inadequate to compensate current equity holders for the risk associated with their investments under a modified prudent investment scheme." *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 312, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). The MPUC's actions under the Act establish LECs relationships with one another; the equation is not complete until the economic relationship with the public is determined in light of the intercarrier relationships. Because Minnesota offers an opportunity to U.S. West to have its rates readjusted, U.S. West has not yet exhausted its state remedies and its takings claim is ripe for review. US West's takings claim is therefore dismissed without prejudice.

## CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. US West's request that this Court find that the MPUC's determinations concerning the U.S. West–AWS Agreement violates 47 U.S.C. §§ 251 and 252 is **GRANTED IN PART, DENIED IN PART,** and **DENIED WITHOUT PREJUDICE IN PART**. It is granted with respect to: (1) Count I (operational support systems as an open issue); (2) Count IV (the collocation of RSUs); and (3) Count VII (the regulation of U.S. West Dex). It is denied without prejudice with respect to Count IX (U.S. West's takings claim) and Count V (the "pick and choose" provision). It is denied in all other respects. The matter is remanded to the MPUC for further determinations consistent with this decision.